UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>APPROXIMATELY $264,790.00 IN U.S. CURRENCY SEIZED FROM TYRONE HUNTER | COMPLAINT FOR FORFEITURE *IN REM*<br><br>*CIVIL ACTION NO.*<br>25-CV-1739 |

### **VERIFIED COMPLAINT FOR FORFEITURE IN REM**

Comes now Petitioner United States of America, by and through the United States Attorney for the District of Columbia and the undersigned Assistant United States Attorney, pursuant to Rule G, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Federal Rules of Civil Procedure, and respectfully states as follows:

*Nature of the Action*

1. This is a civil action *in rem*. Procedures for this action are mandated by Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981, 983, and 984, and the Federal Rules of Civil Procedure.

*Jurisdiction and Venue*

2. This Court has jurisdiction over this action commenced by the United States under 28 U.S.C. § 1345 and over this action for forfeiture under 28 U.S.C. § 1355(a). The Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b)(1)(A) and (B).

3. This Court has venue pursuant to 28 U.S.C. §§ 1355 and 1395(a) and (c).

*Defendant Property*

4.  This action seeks the forfeiture of all right, title, and interest in the following real and personal property altogether consisting of approximately $264,790.00 in U.S. Currency (hereinafter "Defendant Property") seized from Tyrone Hunter on or about April 12, 2023.

**Location of Defendant Property**

5.  The Federal Bureau of Investigation ("FBI") seized the Defendant Currency in Upper Marlboro, Maryland and brought it to Washington, D.C. The United States Marshals Service in the District of Columbia is in possession of the Defendant Property, which will remain within the jurisdiction of this court.

*Statutory Basis for Forfeiture*

6.  Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or 1957 is subject to forfeiture to the United States, as is any property traceable to such violation.

7.  Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—knowing that the transaction is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity violates 18 U.S.C. § 1956(a)(1)(B)(i) (commonly referred to as concealment money laundering).

8.  18 U.S.C. § 981(a)(1)(C) mandates the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7).

9.  Whomever, being an agent of an organization, or of a state, local, or Indian tribal government, or any agency thereof—provided the organization, government, or agency receives, in any

one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance—embezzles, steals obtains by fraud, or otherwise without authority knowingly convers to the use of any person other than the rightful owner or intentionally misapplies, property that is valued at $5,000 or more, and is owned by, or is under the care custody, or control of such organization, government, or agency, violates 18 U.S.C. § 666(a)(1)(A) (theft concerning programs receiving federal funding).

10. Whomever, being an agent of an organization, or of a state, local, or Indian tribal government, or any agency thereof—provided the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance—embezzles, steals obtains by fraud, or otherwise without authority knowingly convers to the use of any person other than the rightful owner or intentionally misapplies, property that corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more, violates 18 U.S.C. § 666(a)(1)(B) (bribery concerning programs receiving federal funding).

11. A violation of 18 U.S.C. § 666(a)(1)(A) or (B) constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(D).

12. Whomever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section violates 18 U.S.C. § 1951 (Hobbs Act extortion under color of official right).

13. A violation of 18 U.S.C. § 1951 constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

14. Whomever having devised or intended to devise a scheme to defraud (or to perform specified fraudulent acts) uses the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts) violates 18 U.S.C. § 1341 (mail fraud).

15. A violation of 18 U.S.C. § 1341 (mail fraud), or a conspiracy to commit such offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

16. Whomever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, violates 18 U.S.C. § 1343 (wire fraud).

17. A violation of 18 U.S.C. § 1343 (wire fraud), or a conspiracy to commit such offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

18. Pursuant to 18 U.S.C. § 981(a)(1)(D) and (E), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), or 666(a)(1) (theft or bribery) concerning programs receiving federal funding). is subject to forfeiture to the United States, as is any property traceable to such violation.

*Factual Basis*

19. Together in a criminal conspiracy, TYRONE HUNTER ("HUNTER") and ANTONIETT TAYLOR ("TAYLOR") fraudulently obtained approximately $264,790.00 through theft, bribery, and extortion from the Washington Metropolitan Area Transit Authority ("WMATA").

20. WMATA is a multi-jurisdictional government agency formed by interstate compact among Washington, D.C., Virginia, and Maryland established for the purpose of providing public transportation in the Washington, D.C. metropolitan area. WMATA has offices in Washington, D.C. WMATA receives more than $10,000 in federal funding each year.

21. HUNTER was an employee and agent of the WMATA during the time of this criminal conspiracy. HUNTER worked as an Investment Recovery Administrator ("IRA") for WMATA's Office of Property Reutilization and Disposition Services, which was also known as WMATA's Office of Surplus Property. As an IRA, Hunter was responsible for the disposal of certain of WMATA's Surplus property. Prior to 2021, IRAs often used receipt of offers, auctions, or negotiated sales to sell surplus property. For those transactions, the IRA handling the sale selected the winning bid.

22. WMATA surplus property was sold "as is" with no conditions for returns or refunds, but customers were permitted to inspect the surplus property before purchasing it. Before 2019, customers were permitted to inspect surplus property offered for sale without an appointment in person at the warehouse where the property was located.

23. WMATA surplus property was sold with standard terms and conditions, which required each customer to pay for the surplus property in full before taking possession of it.

24. TAYLOR was in a romantic relationship with HUNTER since 2016. TAYLOR was the sole proprietor of Empowerment Business Consulting ("EBC"), a trade name that TAYLOR registered in the state of Maryland on August 9, 2018. Between August 2018 and December 2020, EBC won sales for 216 WMATA buses from the Office of Surplus Property in transactions facilitated by HUNTER. During that time period, no other customer won sales of WMATA surplus buses.

25. Starting in 2021, WMATA started using a third-party auction service to sell surplus property, including buses. After this time, EBC did not win any more sales of WMATA surplus buses.

**Criminal Conspiracy**

26. The purpose of the conspiracy was for HUNTER and TAYLOR to use HUNTER's position at the WMATA Office of Surplus Property to enrich TAYLOR by knowingly converting and intentionally misapplying WMATA surplus property buses to TAYLOR's use without paying for them, in order for TAYLOR to sell the buses for cash to a scrap yard for a profit.

27. Between August 2, 2018, and December 21, 2020, HUNTER and TAYLOR carried out the conspiracy through the following manner and means, among others:

   a) TAYLOR registered the trade name for EBC with the state of Maryland and opened a business bank account for EBC in order to conduct business with WMATA;

   b) HUNTER used his position as an IRA to award sales of WMATA surplus property buses to EBC;

   c) HUNTER used his position as an IRA to transfer title to, and physical possession of, WMATA surplus property buses to TAYLOR, as EBC, without TAYLOR or EBC making any payment to WMATA for the buses;

   d) TAYLOR, through EBC, took title to and physical possession of WMATA buses without paying for them;

   e) TAYLOR sold WMATA surplus property buses that she had not paid for to a scrap yard, making a cash profit;

   f) TAYLOR, through EBC, made a payment to WMATA for the buses at a later date, after TAYLOR had already scrapped buses that were the subject of the sale and realized a profit for them; and

   g) HUNTER and TAYLOR signed falsified paperwork at a later date that covered up facts including, but not limited to:

    h) TAYLOR had taken buses from WMATA without paying for them and had scrapped them for a profit;

    i) The amount that EBC later paid for the buses was set after TAYLOR had already scrapped buses that were the subject of the sale.

28. Between September 29, 2018, and November 21, 2018, TAYLOR, through EBC, took title to, and physical possession of, 41 WMATA surplus property buses without paying for them and sold them for scrap.

29. On November 29, 2018, HUNTER signed falsified paperwork documenting the sale of the 41 buses that TAYLOR had already taken title to and possession of and scrapped for cash.

30. On November 30, 2018, TAYLOR signed a check from EBC to WMATA that was submitted to WMATA with the November 29, 2018, sales paperwork.

31. Between May 9, 2019, and May 16, 2019, TAYLOR, through EBC, took title to, and physical possession of, 18 WMATA surplus property buses without paying for them and sold them for scrap.

32. On June 6, 2019, HUNTER signed falsified paperwork documenting the sale of the 18 buses that TAYLOR had already taken title to and possession of and scrapped for cash.

33. Between May 22, 2019, and August 1, 2019, TAYLOR, through EBC, took title to, and physical possession of, 40 WMATA surplus property buses without paying for them and sold them for scrap.

34. On August 5 and August 8, 2019, HUNTER and TAYLOR signed falsified paperwork documenting the sale of the 40 buses that TAYLOR had already taken title to and possession of and scrapped for cash.

35. On August 5, 2019, TAYLOR signed a check from EBC to WMATA that was submitted to WMATA with the August 5, 2019, sales paperwork.

36. Between September 3, 2019, and September 26, 2019, TAYLOR, through EBC, took title to, and physical possession of, 18 WMATA surplus property buses without paying for them and sold them for scrap.

37. On October 3, 2019, HUNTER and TAYLOR signed falsified paperwork documenting the sale of the 18 buses that TAYLOR had already taken title to and possession of and scrapped for cash.

38. On October 1, 2019, TAYLOR signed a check from EBC to WMATA that was submitted to WMATA with the October 3, 2019, sales paperwork.

39. From on or about September 29, 2018, through November 21, 2018, TAYLOR, through EBC, took title to, and physical possession of, 41 WMATA surplus property buses without paying for them and sold them for scrap, receiving approximately $114,029 in cash.

40. From on or about May 9, 2019, to May 16, 2019, TAYLOR, through EBC, took title to, and physical possession of, 18 WMATA surplus property buses without paying for them and sold them for scrap, receiving approximately $50,708 in cash.

41. From on or about May 22, 2019, to August 1, 2019, TAYLOR, through EBC, took title to, and physical possession of, 40 WMATA surplus property buses without paying for them and sold them for scrap, receiving at least $105,000 in cash.

42. From on or about September 3, 2019, to September 26, 2019, TAYLOR, through EBC, took title to, and physical possession of, 18 WMATA surplus property buses without paying for them and sold them for scrap, receiving at least $48,000 in cash.

**Bribery And Extortion**

43. Person A owned a Company A, which resold paratransit vans, among other things. On September 28, 2018, and October 25, 2018, HUNTER demanded that Person A pay him cash in

exchange for the opportunity to fully inspect and test drive WMATA paratransit vans, which were offered for sale as surplus property, before bidding on them.

44. On October 3, 2018, in the District of Columbia and elsewhere, HUNTER, an agent of the Washington Metropolitan Area Transit Authority, did knowingly and unlawfully obstruct, delay, and affect commerce and the movement of any article or commodity in commerce, by extortion, and attempted to take and obtain, and took and obtained ,property not due to him or his office as a public official, from Person A with Person A's consent, under color of official right.

45. On October 3, 2018, in the District of Columbia and elsewhere, HUNTER being an agent of an organization, and of a multi-state and local government and any agency thereof, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of such organization, government, and agency, involving anything of value of $5,000 and more. That is, HUNTER, aided and abetted by another person, corruptly solicited and demanded money from Person A, and accepted and agreed to accept money from Person A, with the intention that HUNTER would be influenced and rewarded in connection with the sale to Person A of WMATA surplus property valued at $5,000 or more.

46. On November 2, 2018, in the District of Columbia and elsewhere, HUNTER, an agent of the Washington Metropolitan Area Transit Authority, did knowingly and unlawfully obstruct, delay, and affect commerce and the movement of any article or commodity in commerce, by extortion, as that term is defined in Title 18 United States Code, Section 1951, and did attempt to do so; that is, HUNTER attempted to take and obtain, and took and obtained property not due to him or his office as a public official, from Person A with Person A's consent, under color of official right.

47. On November 2, 2018, in the District of Columbia and elsewhere, HUNTER being an agent of an organization, and of a multi-state and local government and any agency thereof, corruptly

solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of such organization, government, and agency, involving anything of value of $5,000 and more. That is, HUNTER, aided and abetted by another person, corruptly solicited and demanded money from Person A, and accepted and agreed to accept money from Person A, with the intention that HUNTER would be influenced and rewarded in connection with the sale to Person A of WMATA surplus property valued at $5,000 or more.

48. Person B owned Company B, which resold bus parts, among other things. On January 16, 2019, through January 8, 2021, HUNTER demanded that Person B pay him in exchange for the opportunity to make purchases of WMATA surplus property.

49. On January 16, 2019, through January 8, 2021, in the District of Columbia and elsewhere, HUNTER, did knowingly and unlawfully obstruct, delay, and affect commerce and the movement of any article or commodity in commerce, by extortion, as that term is defined in Title 18 United States Code, Section 1951, and did attempt to do so; that is, HUNTER attempted to take and obtain, and took and obtained property not due to him or his office as a public official, from Person B with Person B's consent, under color of official right.

50. On January 16, 2019, through January 8, 2021, in the District of Columbia and elsewhere, HUNTER, being an agent of an organization, and of a multi-state and local government and any agency thereof, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of such organization, government, and agency, involving anything of value of $5,000 and more. That is, HUNTER, corruptly solicited and demanded money from Person B, and accepted and agreed to accept money from Person B, with the intention that HUNTER would be influenced and rewarded in connection with the sale to Person B

of WMATA surplus property valued at $5,000 or more.

51. Persons C and D also engaged in the resale of paratransit vans. On January 3, 2019, through April 2, 2019, HUNTER demanded that Persons C and D pay him cash in exchange for the opportunity to inspect and purchase WMATA paratransit vans, which were offered for sale as surplus property.

52. On or about January 3, 2019, through on or about April 2, 2019, in the District of Columbia and elsewhere, HUNTER, an agent of the Washington Metropolitan Area Transit Authority, did knowingly and unlawfully obstruct, delay, and affect commerce and the movement of any article or commodity in commerce, by extortion, as that term is defined in Title 18 United States Code, Section 1951, and did attempt to do so; that is, HUNTER attempted to take and obtain, and took and obtained property not due to him or his office as a public official, from Person C and Person D with Person C and Person D's consent, under color of official right.

53. On or about January 3, 2019, through on or about April 2, 2019, in the District of Columbia and elsewhere, HUNTER, being an agent of an organization, and of a multi-state and local government and any agency thereof, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of such organization, government, and agency involving anything of value of $5,000 and more. That is, HUNTER, corruptly solicited and demanded money from Person C and Person D, and accepted and agreed to accept money from Person C and Person D, with the intention that HUNTER would be influenced and rewarded in connection with the sale to Person C and Person D of WMATA surplus property valued at $5,000 or more.

54. The Defendant Property consists of proceeds from the allegations described in this factual basis and are funds involved in money laundering.

## *Conclusion*

The evidence demonstrates, by a preponderance of the evidence or greater, that the Defendant Property constitutes proceeds traceable to and/or property involved in violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1956 (money laundering), 666(a)(1)(A) (theft concerning programs receiving federal funding), 666(a)(1)(B) (bribery concerning programs receiving federal funding), and 1951 (Hobbs Act extortion under color of official right). Therefore, the Defendant Property is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 981(a)(1)(D) and (E).

## *Prayer*

WHEREFORE, the United States of America respectfully prays the Court that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; judgment be entered declaring the Defendant Property to be condemned and forfeited to the United States of America for disposition according to law; and the United States be granted such other and further relief as this Court may deem just and proper.

Respectfully submitted, this the 2nd day of June, 2025.

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:   */s/ Rick Blaylock, Jr.*
Rick Blaylock, Jr.
Assistant United States Attorney
Asset Forfeiture Coordinator
Texas Bar Number 24103294
United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
Telephone: 202-252-6765
Email: rick.blaylock.jr@usdoj.gov
Counsel for the United States

## VERIFICATION

I declare under penalty of perjury that the factual information contained in the foregoing Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the 2nd day of June, 2025.

*Garrett Churchill*
Special Agent Garrett Churchill
Federal Bureau of Investigation